Brian S. King, #4610
Laura C. Nielson, #15008
**LAW FIRM OF BRIAN S. KING**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
laura@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| GAIL F. and KAITLYN F., <br><br> Plaintiffs, <br><br> vs. <br><br> QUALCARE INC. and MERIDIAN HEALTH TEAM MEMBER BENEFIT PLAN, <br><br> Defendants. | COMPLAINT <br><br> Civil No. 1:15-CV-00130 EJF |

Plaintiffs Gail F. ("Gail") and Kaitlyn F. ("Kaitlyn"), collectively known as "Plaintiffs" or "F. family", through their undersigned counsel, complain and allege against Defendants Meridian Health Team Member Benefit Plan ("the Plan") and QualCare, Inc. ("QCI") as follows.

**PARTIES, JURISDICTION AND VENUE**

1. Gail and Kaitlyn are natural persons residing in Los Angeles County, California. Gail is Kaitlyn's mother. At the time the medical treatment in question was provided, Plaintiffs resided in Monmouth County, New Jersey.

1

2. QCI is a corporation doing business in the State of New Jersey. QCI is the claims administrator for the Plan. QCI is owned and operated by Cigna Health and Life Insurance Company ("Cigna").

3. Meridian Health ("Meridian") is a corporation with its headquarters in New Jersey. During the relevant time frame, Meridian was Gail's employer.

4. The Plan is a self-funded group health benefit plan sponsored by Meridian for its employees and their dependents. Gail was a participant in the Plan and Kaitlyn was a beneficiary of the Plan.

5. The Plan is an employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

6. Kaitlyn received medical care and treatment in the State of Utah at Island View Residential Treatment Center ("IVRTC"), a residential treatment facility providing mental health care to adolescents, aged thirteen to eighteen.

7. QCI and the Plan denied some of Kaitlyn's claims for payment of her medical expenses in connection with her treatment at IVRTC. This lawsuit is brought to obtain this Court's order requiring the Plan to pay Kaitlyn's unpaid expenses incurred during her treatment at IVRTC.

8. This Court has jurisdiction of this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because the medical treatment at issue in this case was provided in the State of Utah and the financial obligations of the Defendants to Kaitlyn's healthcare providers were incurred in the state of Utah. In addition, the Plaintiffs wish to maximize the likelihood that the sensitive

nature of the mental health treatment provided for Kaitlyn will not become publicly known and believe the likelihood of maintaining her privacy is increased by bringing their claim in Utah. Based on ERISA's nationwide service of process provision and 28 U.S.C. § 1391, venue is appropriate in the state of Utah.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## BACKGROUND FACTS

### Kaitlyn's Developmental and Medical Background

11. Kaitlyn is the youngest of seven children. She met all developmental milestones.

12. Kaitlyn's biological father died in the World Trade Center collapse on 9/11/01, two days before Kaitlyn's sixth birthday. She attended camps and therapy groups for children who lost relatives in the events of 9/11 for most of her childhood.

13. Kaitlyn was reasonably social growing up, but around 8th grade, she started to have trouble interacting in social groups.

14. When Kaitlyn was in 8th grade, she reported friends bullying her at school to her mother, began making excuses to avoid attending school, and began using marijuana.

15. Kaitlyn experimented with marijuana use; infrequently at first, then on a daily basis. During a community service trip to Spain, she smoked marijuana heavily with a boy who was part of the service group.

16. During her junior year in high school, Kaitlyn began avoiding her homework, skipping classes, and exhibiting disruptive behavior in class.

17. During the same time frame, Kaitlyn physically assaulted her older sister.

18. During her junior year of high school, Kaitlyn went to live with her brother in Boston in an attempt to remove her from a negative friend group. She lived there for two months and then her brother insisted she return home.  Upon returning home, Kaitlyn went back to her old group of friends and resumed her use of marijuana and skipping school.

19. Prior to her admission to IVRTC, on separate occasions, Kaitlyn took her mother's and her sister's cars without their permission. Kaitlyn did not have a driver's license at the time. The instance involving her sister's car resulted in an accident with damages totaling over $3,000.00. Kaitlyn was required to go to court as a result of that accident.

20. Kaitlyn had also experienced suicidal ideations, and attempted suicide twice. Both attempts were thwarted by family members.

## Kaitlyn's Treatment at IVRTC

21. During Kaitlyn's 11th grade year, she ran away from home and was suspended from school. She was then sent to Second Nature Wilderness Program ("Second Nature"), where she stayed for four months.

22. At Second Nature she received mental and behavioral health therapy in an outdoor wilderness setting.

23. Following her time at Second Nature, Kaitlyn was transferred to The Carlbrook School, a therapeutic boarding school. Kaitlyn spent six weeks at The Carlbrook School, before she was transferred to an emergency room for suicidal ideation. Following her release from the hospital, Kaitlyn was not readmitted to Carlbrook School, but returned to her mother's home.

24. Kaitlyn ran away from home and her mother called the police. When they picked Kaitlyn up, they took her to Jersey Shore Medical Center for evaluation. Because Jersey Shore

Medical Center did not have any available beds, Kaitlyn was admitted to Monmouth Medical Center, where she stayed for several days.

25. At the recommendation of Kaitlyn's treating physicians at Monmouth Medical Center, Kaitlyn was transferred to IVRTC.

26. Kaitlyn was admitted to IVRTC on November 15, 2012.

27. At the time of her admission to IVRTC, Kaitlyn was diagnosed as follows:

| | |
|---|---|
| AXIS I | 296.33 MAJOR DEPRESSIVE DISORDER, RECURRENT, SEVERE |
| | 314.9 ATTENTION-DEFECIT/HYPERACTIVITY DISORDER NOS |
| | 304.30 CANNABIS DEPENDENCE |
| | 305.90 POLYSUBSTANCE ABUSE |
| | V62.82 BEREAVEMENT |
| | V61.20 PARENT-CHILD RELATIONAL PROBLEM |
| | V61.8 SIBLING RELATIONAL PROBLEM |
| AXIS II | 799.9 DIAGNOSIS DEFERRED ON AXIS II |
| AXIS III | NONE |
| AXIS IV | PROBLEMS WITH PRIMARY SUPPORT GROUP |
| | PROBLEMS RELATING TO THE SOCIAL ENVIRONMENT |
| | EDUCATIONAL PROBLEMS |
| AXIS V | CURRENT GAF: 24, HIGHEST PAST YEAR GAF: 32[1] |

28. Kaitlyn was unhappy about being placed in a residential treatment program, but despite her feelings, she committed to her treatment plan. Her medical records documented frequent declines in progress but Kaitlyn's condition slowly improved.

---

[1] G.A.F., or global assessment of functioning, was developed as a tool for mental healthcare providers to assess the overall level of functioning and ability to carry out activities of daily living for their patients.  There is a separate scale utilized when the patient is a child or adolescent.  A GAF of 24 on the child's global assessment scale indicates "Unable to function in almost all areas, e.g., stays at home in ward or in bed all day without taking part in social activities OR severe impairment in reality testing OR serious impairment in communication (e.g. sometimes incoherent or inappropriate)." D. Shaffer, M.S. Gould, H. Bird, and P. Fisher Modified from: Rush J, et al: Psychiatric Measures, APA, Washington DC, 2000.

29. Kaitlyn continued to experience difficulties in interacting with peers while in treatment. She was not taking responsibility for her actions.

30. While Kaitlyn showed improvements in her ability to identify, express, and manage her feelings, she continued to remain closed off and focused her attention on "helping" other residents.

31. Kaitlyn's Discharge Evaluation shows that her GAF score improved while at IVRTC. Her discharge diagnosis was as follows:

| | |
|---|---|
| AXIS I | 296.33 MAJOR DEPRESSIVE DISORDER, RECURRENT, SEVERE |
| | 314.9 ATTENTION-DEFICIT/HYPERACTIVITY DISORDER NOS |
| | 304.30 CANNABIS DEPENDENCE |
| | 305.90 POLYSUBSTANCE ABUSE |
| | V62.82 BEREAVEMENT |
| | V61.20 PARENT-CHILD RELATIONAL PROBLEM |
| | V61.8 SIBLING RELATIONAL PROBLEM |
| AXIS II | 799.9 DIAGNOSIS DEFERRED ON AXIS II |
| AXIS III | NONE |
| AXIS IV | PROBLEMS WITH PRIMARY SUPPORT GROUP |
| | PROBLEMS RELATED TO THE SOCIAL ENVIRONMENT |
| | EDUCATIONAL PROBLEMS |
| AXIS V | CURRENT GAF:60, HIGHEST PAST YEAR GAF: 35 |

32. According to the Discharge Summary, Kaitlyn completed her treatment plan at IVRTC. The Discharge Plan recommended continued individual therapy, family therapy, and medication management services for Kaitlyn.

### The Plan's Denial of Coverage and the F. Family's Appeal

33. Claims were submitted to Cigna and coverage for treatment was approved through March 4, 2013. However, claims after March 4, 2013 were denied. Claims were also submitted to QCI.

34. In the Stage 1 Denial letter from QCI, dated August 14, 2013, QCI states:

6

> After review of the available information regarding the above request, it has been determined that Long Term Residential Treatment is not a covered benefit, as indicated in your Summary Plan Description, page 29.

35. There is no indication in the Summary Plan Description ("SPD"), page 29, that long term residential treatment is not a covered benefit under the Plan.

36. In addition to the lack of specification regarding long term residential treatment, QCI referenced page 53 of the Summary Plan Description, stating that Kaitlyn's treatment at IVRTC was not medically necessary. John Renda, M.D., the author of the denial letter, stated:

    > The patient's diagnosis does not meet the specified criteria outlined above and therefore is not a covered benefit. In addition, based on the documentation submitted, the intensity of services … did not warrant an acute level of care or partial hospitalization program.

    The language of the SPD also does not state that only an acute level of treatment for inpatient care for mental and nervous conditions or substance abuse will be covered.

37. Gail appealed the denial of coverage on September 6, 2013. In her appeal, Gail provided a detailed history for Kaitlyn and included, among other things, the Psychological Assessment Report from Second Nature done by Dr. Lorena Bradley (P.h.D.) and the Psychiatric Evaluation from Carlbrook School done by Dr. Floyd Wiseman (M.D.) indicating the necessity for Kaitlyn's treatment at IVRTC.

38. Among other things, Gail argued that Kaitlyn was receiving active treatment at a licensed healthcare facility for both her mental health conditions and substance abuse and the care was not custodial. In addition, Gail pointed out that IVRTC was a participating facility with QCI.

39. Gail also argued that QCI had not carried out a meaningful dialogue with her because it had failed to identify how Kaitlyn's condition did not meet the medical necessity definition in the plan, nor did QCI provide accurate and specific references to the SPD that supported its conclusion that the services provided to Kaitlyn were not covered. Gail posed specific questions asking QCI to identify what additional symptoms or behaviors were necessary in order for Kaitlyn's treatment to be medically necessary.

40. Despite Gail's request for specific information about how the Plan came to the conclusion that Kaitlyn's treatment was not medically necessary, QCI did not address any of Gail's arguments. QCI failed to reference the specific records used to make its determination, nor did it specify who reviewed the medical records, or identify their qualifications.

41. Gail argued that QCI's denial conclusions fell short of ERISA requirements and that the denial should have contained specific references to language in the SPD stating that long term residential treatment was not covered under the Plan.

42. Gail also argued that the refusal of QCI to cover Kaitlyn's treatment at IVRTC failed to comply with the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA").

43. QCI maintained the denial on behalf of the Plan in a letter dated September 26, 2013. The denial letter, in its entirety, contained two pages of text and two pages of appeal application paperwork. The denial letter stated:

> We have thoroughly reviewed this matter, including any additional material you may have brought to our attention. The relevant provisions of the Meridian Health Team Member Benefit Plan under which you are covered, are outlined in the Summary Plan Description as follows:
>
> MEDICAL BENEFITS (pg. 29)
> **Mental and Nervous Conditions**

> b. Inpatient. Pre-Certification required. Members are entitled to receive up to the maximum number of inpatient days specified in the Schedule of Benefits during any calendar year for Mental and Nervous Conditions. The following services shall be covered under inpatient treatment: (1) lodging and dietary services; (2) physician, psychologist, nurse and trained staff services; (3) diagnostic X-ray; (4) psychiatric, psychological and medical laboratory testing; (5) drugs, medicines, equipment use and supplies.
>
> PLAN EXCLUSIONS / Exclusion #32 (pgs. 34 & 36)
> For all Medical Benefits shown in the Schedule of Benefits, a charge for the following is not covered:
>
> **Not Specified as Covered**. Services, treatments and supplies which are not specified as covered under this Plan.

   Based on these provisions, we have concluded that our original decision to deny the claims will be upheld, as residential treatment is not specified as being covered. No benefits will be paid.

44. Gail requested a second level appeal on December 9, 2013. Gail again argued that Kaitlyn's active treatment at a licensed healthcare facility was not custodial.

45. Gail argued that the SPD covered unlimited benefits for mental health and substance abuse, and that it did not contain a specific exclusion for multidisciplinary therapy services that IVRTC provided.

46. Gail also argued that QCI was not appropriately applying the requirements of the MHPAEA.

47. QCI upheld its denial in a letter dated January 31, 2014.

48. QCI's letter stated that the denial was being upheld on the basis of exclusions in the SPD. The letter stated:

> A review of your appeal has been conducted by QualCare's Stage 2 Administrative Appeals Committee. Based on our review of your appeal it has been determined that the claims for services rendered at Island Residential Treatment Center [sic] were correctly processed. The claims were denied on the basis of exclusions that are stated in the SPD, under the section Plan Exclusions:

9

> #7 Custodial Care: Services or supplies provided mainly as a rest cure, maintenance or Custodial Care.
>
> #53 Not specified as covered: Services, treatments and supplies which are not specified as covered under this Plan.
>
> Based on the information presented in your appeal, it is the decision of the Stage 2 Administrative Appeals Committee to deny the claims submitted for Island Residential Treatment Center [sic], based on the corresponding exclusions as outlined in the Plan's SPD.

49. QCI failed to identify who reviewed the second level appeal, what their qualifications were, and failed to reference the specific terms in the SPD which supported their denial.

50. QCI also failed to address the MHPAEA requirements, failed to answer the direct questions that Gail posed, and failed to engage in a meaningful dialogue that would allow Gail to respond to any legitimate concerns QCI or the Plan may have had.

51. Gail requested a stage 3 appeal via a letter dated April 9, 2014.

52. In her appeal, Gail outlined the difficulty she and her healthcare advocate had in acquiring the Level 3 appeal form and the lack of timeliness with which she received the paperwork.

53. Gail pointed out in her appeal that QCI mis-identified IVRTC, repeatedly referring to it as "Island Residential Treatment Center".

54. Gail argued that the continued denial of the treatment services Kaitlyn received while at IVRTC demonstrates non-compliance with the MHPAEA.

55. In the appeal, Gail included the Custodial Care definition, as it is stated in the SPD:

> CUSTODIAL CARE – Any service or supply, including room and board which:
> (a) is furnished to help a Member meet his or her routine daily needs; or
> (b) can be furnished by someone who has no professional health care training or skills.

> Examples of Custodial Care are help walking and getting out of bed; assistance in bathing, dressing, feeding, or supervision over medication which could normally be self-administered.

56. Because QCI listed Custodial Care as one of the exclusions for the basis of their denial, Gail provided a statement from Dr. Kirk Simon (M.D.), who was Kaitlyn's Attending Phyisican at IVRTC:

> …Island View Residential Treatment Center treats youths between the ages of 11-17 who struggle with psychological, psychiatric and emotional disorders. IVRTC is not a custodial care facility as defined in the patient's policy. Island View Residential Treatment Center is licensed by the State of Utah as a Mental Health/Substance Abuse/Intermediate Secure Care Facility.
>
> Island View Residential Treatment Center does not provide non health related services such as assistance with feeding, dressing, and other daily living activities. Our patients are fully capable of taking care of their own activities of daily living. Island View Residential Treatment Center does not provide services that only meet the personal needs of the patient or help them to maintain a certain level of functioning or services that do not require continued administration by trained medical personnel.
>
> After reviewing this definition, I can state that the care Kaitlyn received was not custodial in nature in any way, shape, or form. Kaitlyn received active treatment for her psychiatric conditions and received multiple therapies each day as a patient in our facility. All who treated her here at IVRTC had the technical skills to treat her conditions…

57. Gail argued that QCI could not continue to deny claims relating to Kaitlyn's treatment at IVRTC without conducting a complete and fair analysis of the claims.

58. Gail's level 3 appeal letter was seven pages long.

59. QCI denied the level 3 appeal via a letter dated May 29, 2014. The only part of that letter that provided a substantive response to the information provided by Gail in her April 9, 2014, appeal stated:

> The Stage 3 Administrative Appeals Committee has thoroughly reviewed your appeal, including the additional materials you have brought to our attention. The Administrative Appeals Committee has determined that the claims for services provided by IVRTC were correctly processed according to your plan exclusions.

11

> The Meridian Health Team Member Benefit Plan excludes Residential Care as stated as Custodial Care as services or supplies provided mainly as a rest cure, maintenance or Custodial Care.
>
> QualCare, Inc. as the Plan Administrator is contractually obligated to properly administer the Meridian Health Team Member Benefit Plan as stated in the Summary Plan Description (SPD). Your Summary Plan Description outlines your "Rights under ERISA".

60. QCI repeatedly failed to engage in a meaningful dialogue with Gail regarding what, if any, additional information she needed to provide to allow QCI to evaluate the medical necessity of Kaitlyn's treatment, failed to address any of the direct questions Gail posed in her appeals, and repeatedly failed to reference specific information, medical records, and other documents it used to determine medical necessity.

61. QCI repeatedly failed to respond to the points Gail presented regarding the Plan's failure to provide access to coverage for mental health and substance abuse treatment as required by the MHPAEA.

62. QCI failed to consider the substance of the information and arguments presented to QCI by Gail in her appeal letters.

63. The denial of benefits for Kaitlyn's care after March 4, 2013 was a breach of contract and caused the F. family to incur medical expenses that should have been paid by the Plan.

64. Gail exhausted her appeal obligations under ERISA.

## CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

65. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators.  It sets forth a special standard of care upon a plan fiduciaries such as QCI, acting an agent of the Plan, to "discharge [its] duties in respect to claims processing

solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

66. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

67. QCI and the Plan breached their fiduciary duties to Kaitlyn when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Kaitlyn's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of Kaitlyn's claims.

68. The actions of QCI and the Plan in failing to provide coverage for Kaitlyn's medically necessary treatment at IVRTC are a violation of the terms of the Plan and QCI's medical necessity criteria.

69. The actions of QCI and the Plan, as outlined above, have caused damage to Gail and Kaitlyn, in the form of denial of payment for medical services provided to Kaitlyn from March 4, 2013 through her discharge on July 5, 2013.

70. QCI and the Plan are responsible to pay Kaitlyn's medical expenses as benefits due under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the amount of over $50,000.00, the total amount that is owed for Kaitlyn's medically necessary treatment at IVRTC under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 1st day of October, 2015.

                                                  By    s/ Brian S. King
                                                          Brian S. King
                                                          Attorney for Plaintiffs

County of Plaintiffs' Residence:
Los Angeles, CA.